IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SEKOU T. RUDOLPH,                    :
(AIS #220674)
                                     :
     Plaintiff,
                                     :
vs.                                       CIVIL ACTION 12-CV-263-WS-M
                                     :
PAMELA BARBER, *et al.*,
                                     :
     Defendants.
                                     :

## REPORT AND RECOMMENDATION

     Plaintiff, an Alabama prison inmate proceeding <u>pro</u> <u>se</u> and <u>in</u> <u>forma</u> <u>pauperis</u> filed a Complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on the motion for summary judgment of Defendants, Dr. Pamela Barber, Rene Nettles, Debra Poindexter, Donny Myers, and Correctional Medical Services, Inc. ("CMS") (Docs. 1, 17, 18); and Plaintiff's opposition thereto. (Doc. 40). For the reasons stated below, it is recommended that the motion for summary judgment of Defendants Barber, Nettles, Poindexter, Myers, and CMS be granted and that Plaintiff's action against these Defendants be dismissed with prejudice.

## I.   SUMMARY OF FACTUAL ALLEGATIONS

     From its review of the record, the Court summarizes the

parties' allegations which are material to the issues addressed in this Report and Recommendation. On April 5, 2011, while incarcerated at Holman Correctional Facility ("Holman"), Plaintiff suffered injury to his head and ribs during an altercation with the Correctional Emergency Response Team ("C.E.R.T."). (Doc. 1 at 3). Immediately after the incident, Plaintiff received seven stiches to a one-inch laceration on his right brow, a tetanus shot and antibiotic to prevent infection, and Ultram pain medication. (Doc. 17-3 at 52). Dr. Barber ordered an x-ray of his skull that was performed the next day. (Id. at 49). Plaintiff's complaint relates to the delay and denial of medical care received after this initial treatment.

On April 6 and 7, 2011, Plaintiff submitted a health services request form stating he needed medication for severe head and rib pain on his right side. (Doc. 17-3 at 7, 8). Plaintiff was seen during sick call by Nurse Nettles on April 7, 2011, where he informed Nettles that Motrin and Tylenol were ineffective at alleviating his pain.[1] (Id. at 9, 10). Nurse Nettles ordered an x-ray be taken of his right rib cage, and Dr. Barber signed off on the order and treatment provided by

---

[1] Plaintiff had been prescribed one Ultram tablet after the C.E.R.T. incident two days earlier, and there is no evidence suggesting that Plaintiff was taking any type of pain reliever at the time he spoke to Nurse Nettles on April 7, 2011. (Id. at 55).

2

Nettles.  (Id. at 10, 55).  On April 14, 2011, Dr. Barber
reviewed the x-ray results of Plaintiff's skull and ribs; both
results were normal with no evidence of fractures or
dislocations.  (Id. at 49, 50).

A third health services request was made on April 14, 2011,
with complaints of head pain, dizziness, eye pain, and lack of
visual focus.  (Id. at 11, 12).  Nurse Nettles saw plaintiff
that same day and prescribed Pain-Off tablets, two tablets to be
taken twice a day for a week, and ordered he be seen by the
optometrist for his symptoms, and Dr. Barber, again, reviewed
the sick call notes and signed off on the treatment plan.  (Id.
at 11, 13, 55).  An optometrist examined Plaintiff on May 4,
2011, for his complaints of decreased vision and tingling of his
right brow.  (Id., p. 44).  The visual acuity of both his right
and left eyes had changed from 20/25 when he was last examined
on December 14, 2010, to 20/40, so glasses were prescribed and
ordered for Plaintiff.  (Doc. 40 at 18; Doc. 17-3 at 44-46).
The optometrist noted a swollen area on or above Plaintiff's
right brow; however, no other abnormalities were detected.
(Doc. 17-3 at 44).  The optometrist ordered orbital x-rays be
taken and evaluated by the on-site doctor at Holman.  (Id.).
Given that x-rays of Plaintiff's skull had previously been taken
on April 6, 2011, and no abnormalities were identified, no

3

further x-rays were done.  (Id. at 55).

Plaintiff submitted his fourth health services request form on May 25, 2011, complaining that he had still "not seen the doctor" and continued to suffer with extremely painful headaches.  (Id. at 14).  Nurse Nettles examined the Plaintiff the following day and referred him to Dr. Barber.  (Id. at 16). Plaintiff was seen by Dr. Barber five days later on June, 1, 2011.  (Id., p. 48).  At that time, Dr. Barber prescribed Plaintiff Pain-Off, two tablets to be taken twice a day for two weeks, and ordered an MRI scan of Plaintiff's brain in attempt to find out why he was still having headaches and orbital pain. (Id.).  The MRI was conducted on June 30, 2011, and the results of the scan were normal and unremarkable.  (Id. at 51).

On July 8, 2011, Plaintiff submitted his fifth health services request with complaints of headaches and sharp visual pains, as well as the need for stronger pain medication.  (Id. at 17).  Plaintiff was seen by Nurse Nettles the next day, and his chart and complaints were reviewed by Dr. Barber on July 11, 2011.  (Id. at 17-19).

August 1, 2011, Plaintiff submitted his sixth health services request form stating, "I am still experiencing the same symptoms as far as my eye is hurting and I am having dizzy spells, blurred vision and sharp pains."  (Id. at 20).  Nurse

Poindexter saw Plaintiff the next day and, per Dr. Barber, dispensed Pain-Off tablets, two tablets to be taken twice a day for a week, to help manage Plaintiff's pain.  (Id. at 22, 56).

Over four months later, on December 13, 2011, Plaintiff filed his seventh health services request form stating, "I am having head-aches.  Also, my right eye is hurting.  Also, I am having blurred vision in this area.  I am seeing colored spots." (Id. at 27).  Nurse Poindexter examined Plaintiff this same day and referred him to the optometrist.  (Id.).  Plaintiff was also offered Tylenol, Motrin, or Pain-Off for his pain symptoms, but he refused all "several times."[2]  (Id. at 29).  The optometrist saw Plaintiff on December 21, 2011.  (Id. at 47).  The previous x-ray of Plaintiff's skull and MRI were reviewed and another dilated eye exam was conducted, but all results were negative. (Id.).  The optometrist told Plaintiff his eyes were "healthy" and his symptoms of "tingling" and "headaches" were "not due to orbital fracture or eye damage;" Plaintiff was advised by the optometrist that if his symptoms persisted, he needed a medical evaluation.  (Id.).

The eighth health services request was submitted on January 25, 2012, and Plaintiff stated, "I am still experiencing head-

---

[2] Plaintiff's explanation for refusing the offered pain medication is that he had previously tried them all, and they were ineffective at treating his pain.  (Doc. 40 at 4).

aches and blurred vision.  My right-eye hurts behind it as-well-at times it feels as if I am straining it." (Id. at 30).  A referral to the eye doctor was made, but a release dated February 24, 2012, in Plaintiff's chart stated that Plaintiff refused the optometry treatment.  (Id. at 33).  The release is not signed by Plaintiff but is attested by two witnesses who affirm that Plaintiff refused the "eye dr. appt." and refused to sign the release form as well.  (Id.).  Plaintiff, however, denies refusing this optometric treatment.  (Doc. 40, p. 4).

Plaintiff filed four medical grievances while incarcerated at Holman that relate to the issue of this case.  (Id. at 65-74).  The first grievance was filed on April 12, 2011, one week after the C.E.R.T. incident.  (Id. at 65).  The grievance states,

> I NEED to see the Doctor immediately.  I am having SEVERE headaches, sharp pains right over my right eye due to 7 stitches I received . . . . I asked for stronger medication from (RN) Nettles after she offered Motrin and Tylenol when she was already informed by me that these two medications was [sic] not stopping the pain.  Therefore, she told me that I will be referred to see the doctor for proper medication and so forth.  But, come to find out an appointment was NEVER schedule[d].  Which means I have not received any pain sedative to alleviate the pain in a whole week.

(Id.).  In response to his filing, Plaintiff was told his x-rays were all normal and that the doctor had reviewed his sick call record and determined not to order any stronger medication.

6

(Id. at 66).  Plaintiff was also informed of the medical policy at Holman, that he would not be "scheduled an appointment with the doctor until the second sick call for the [same] complaint or unless it is an emergency." (Id.).  In his second and third grievances, filed on April 28, 2011, and May 5, 2011, respectively, Plaintiff complained that he still had not been evaluated by the doctor.  (Id. at 67, 69).  Plaintiff was once again informed of the medical procedure at the prison and is told he must "go through sick call to get a doctor's appointment." (Id. at 70; see also Id. at 68). The fourth medical grievance was filed on June 2, 2011, one day after Dr. Barber personally examined Plaintiff; it states

> I need to see a [sic] eye-specialist.  Plus a
> neurologist because, my right-eye has been hurting.
> Plus, I am experiencing blurred vision from being hit
> on 4/5/11 with a police stick . . . Also, I need to
> know why Doctor Barbers ignored several sick-calls
> slips – in which I got charged for.  It took Doctor
> Barbers approximately (56) days to finally set an
> appointment to where I was seen . . . on 6/1/11.

(Id. at 73).  The response from the Director of Nursing provided

> The only person that can request that you be seen by
> the specialist is Dr. Barber.  She has not ordered
> that, so you will not be going to see an eye
> specialist or neurologist.  Also, Dr. Barber does not
> do sick call.  The nurses do.  If they send your
> jacket over to the doctor, she will review what has
> been done and what the nurses found and make a
> decision based on that.

(Id. at 74).

7

On June 6, 2011, five days after being examined by Dr. Barber, Plaintiff sent a letter to Defendant Myers detailing his need to see an ophthalmologist and neurologist.  (Doc. 40 at 26).  Plaintiff addresses the letter to "Dr. Myers" and appears to write with the assumption Defendant Myers is the supervising doctor over the entire medical staff.  (Id.).  Plaintiff describes his symptoms and explains that "Dr. Barbers purposely told [him] she had ignored several of [his] sick-calls slips." (Id.).  Plaintiff stated that Dr. Barbers failed to provide him treatment and x-rays as ordered by the optometrist.  (Id.).  He asserts he is "untreated" and requests seeing Myers personally. (Id.).  What is apparently Defendant Myers' response to Plaintiff's letter is an unsigned, handwritten notation at the bottom of the letter that states, "I am not a doctor.  Dr. Barber is the Medical Director for this site.  I stand behind her decisions."  (Id.).  Plaintiff did not submit any further medical grievances, nor did he subsequently file an appeal to any grievance response.

In total, Plaintiff submitted eight sick-call requests related to pain, headaches, and blurry vision after the C.E.R.T. incident.[3]  While he was seen by medical staff for each sick call

---

[3] Plaintiff submitted five sick call requests unrelated to the issue before this Court; Plaintiff was promptly seen and treated for each complaint.  (See Id. at 24-26 (Plaintiff complains of

request, Plaintiff alleges that Defendants violated his rights
under the Eighth Amendment by delaying his medical treatment,
thereby causing his symptoms to worsen.  (Doc. 40 at 6-7).

## II.  PROCEDURAL ASPECTS OF THE CASE

On April 13, 2012, Plaintiff filed the present § 1983
Complaint in this Court.  (Doc. 1).  In the Answer and Special
Report filed on behalf of Defendants on July 30, 2012,
Defendants deny Plaintiff's allegations and assert various
defenses.[4]  (Doc. 18).  Plaintiff filed a response in opposition

_____

cold symptoms); Id. at 31-32 (Plaintiff complains of pain on his
left side after falling in the shower); Id. at 34-36 (Plaintiff
complains of cold symptoms)).
    Following Plaintiff's last sick call request regarding
complaints of headaches and visual pain and blurriness,
Plaintiff submitted two requests with complaints of left gum and
jaw pain and throbbing headaches.  (Id. at 37-42).  Plaintiff
was prescribed an antibiotic for the infected gum area, Tylenol
and Motrin for the pain symptoms, and was promptly referred to a
dentist. (Id. at 39, 43).  Plaintiff ultimately refused the
suggested dental treatment of tooth extraction since the dentist
informed him that the pain was mostly due to the infection and
that the tooth could potentially be saved.  (Doc. 40, p. 5).
Plaintiff also refused the tooth extraction due to his past
experience with the dentist.  (Id.). Plaintiff had a tooth
extracted by the same dentist in July of 2009, and claims "the
dentist cut quarterly around the wrong gum" and tooth, and he
was, therefore, reluctant to undergo the same surgery again if
it was not absolutely necessary.  (Id.; see id. at 19-23 for
grievances filed related to the dental procedure).

[4] Defendants assert qualified immunity as one defense.  (Doc. 18
at 3).  The Court notes that, as private actors, the medical
Defendants, Barber, Nettles, Poindexter, Myers, and CMS are not
entitled to immunity, whether qualified or absolute.  See Swann
v. S. Health Partners, Inc., 388 F.3d 834, 837 (11th Cir. 2004)
("The parties agree that as a private entity, SHP [a private

to Defendants' Answer and Special Report.  (Doc. 40).  On July 31, 2012, the Court converted the Answer and Special Report of the Defendants to a motion for summary judgment (Doc. 19) and took the case under submission on September 5, 2012.  Plaintiff claims his constitutional rights were violated when he was denied appointments with Dr. Barber in the course of sick call screenings and, thereafter, by Dr. Barber's failure to refer him to an ophthalmologist and neurologist.  (Doc. 1 at 9-10; Doc. 40 at 8).  The Defendants' motion for summary judgment and Plaintiff's response thereto are now before the Court.[5]

### III. <u>SUMMARY JUDGMENT STANDARD</u>

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles.  The

corporation employed by the County to provide medical care to inmates at the county jail] is not entitled to assert a qualified immunity defense."); <u>Hinson v. Edmond</u>, 205 F.3d 1264, 1265 (11th Cir. 2000) (a "privately employed prison physician" "is ineligible to advance the defense of qualified immunity"); <u>Edwards v. Ala. Dep't of Corr.</u>, 81 F. Supp. 2d 1242, 1254 (M.D. Ala. 2000) (a private entity contracting with a state to provide medical services to state inmates "is not entitled to qualified immunity....").

[5] A Motion to Amend Complaint was filed by Plaintiff on September 26, 2012.  (Doc. 33).  The amendment detailed the assault by the Correctional Emergency Response Team that led to his eye injury, which is the basis of the present lawsuit.  (<u>Id.</u>).  The motion, however, failed to identify any specific defendants or claims. (<u>Id.</u>).  The Court determined that granting Plaintiff's motion would be futile since the amended complaint would be subject to dismissal under 28 U.S.C. § 1915(e)(2)(B)(ii).  (Doc. 39 at 8; Docs. 46, 47).

<u>Federal Rules of Civil Procedure</u> grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.  <u>Federal Rule of Civil Procedure</u> 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986), the Supreme Court held that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . ." However, all of the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Jackson v. BellSouth Telecomms.</u>, 372 F.3d 1250, 1280 (11th Cir. 2004).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex</u>, 477 U.S. at 323.  The movant can meet

this burden by presenting evidence showing there is no dispute of material fact or by pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-25.

Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  See Stabler v. Fla. Van Lines, Inc., No. 11-0103-WS-N, 2012 WL 32660, *5 (S.D. Ala. Jan. 6, 2012) (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)).  Summary judgment is proper when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case."  McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004) (citations and internal quotation marks omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted).  "After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there

is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." AGSouth Genetics, LLC v. Cunningham, No. 09-745-C, 2011 WL 1833016, *2 (S.D. Ala. May 13, 2011).

## IV. DISCUSSION

Plaintiff alleges in his Complaint that his Eighth Amendment rights were violated by: (1) Defendants Nettles and Poindexter when they delayed his treatment by failing to timely refer him to the doctor in the course of routine sick calls, (2) Defendant Barber failing to timely examine him and failing to refer him to needed specialists for care, (3) Defendant Myers for contributing to the delay of treatment by supporting Dr. Barber's recommendations and medical decisions, and (4) Defendant CMS based on the theory of *respondeat superior*. (See Doc. 1 at 6; Doc. 40 at 8). For each of the reasons set forth below, Plaintiff's claims fail as a matter of law.

### A.   Eighth Amendment Delay of Medical Care Claim.

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." Campbell v.

13

Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v.
Gamble, 429 U.S. 97, 104 (1976)).

In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the
Eleventh Circuit delineated the objective and subjective
portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two
> components, an objective component, which inquires
> whether the alleged wrongdoing was objectively
> harmful enough to establish a constitutional
> violation, and a subjective component, which inquires
> whether the officials acted with a sufficiently
> culpable state of mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8
(1992)).  To meet the objective element required to demonstrate
a denial of medical care in violation of the Eighth Amendment, a
plaintiff first must demonstrate the existence of an
"objectively serious medical need."  Farrow v. West, 320 F.3d
1235, 1243 (11th Cir. 2003).  A serious medical need is "'one
that has been diagnosed by a physician as mandating treatment or
one that is so obvious that even a lay person would easily
recognize the necessity for a doctor's attention.'"  Id.
(quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176,
1187 (11th Cir. 1994), overruled in part on other grounds by
Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002)).  "In either of
these situations, the medical need must be one that, if left
unattended, pos[es] a substantial risk of serious harm."  Id.

14

(internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. Farrow, 320 F.3d at 1243. "Deliberate indifference" entails more than mere negligence. Estelle, 429 U.S. at 106; Farmer v. Brennan, 511 U.S. 825, 835 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting Farmer and Estelle, this Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, 182 F.3d at 1255; Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46.

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." Hill, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical

15

attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." Id.

> The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

Hill, 40 F.3d at 1188-89 (internal citations omitted) (footnotes omitted).

The Court must first determine if Plaintiff's headaches, blurry vision, and eye pain constitute an objectively serious medical need. Given that these symptoms could indicate a serious or even life-threatening problem, for purposes of this motion for summary judgment, the Court will assume they represent a serious medical need. Therefore, the Court turns to the second, subjective element of Plaintiff's claim, that is, whether Defendants were deliberately indifferent to Plaintiff's

16

serious medical need.

### 1.   Delay in Obtaining Appointment with Doctor

In this case, Plaintiff does not dispute that he received immediate and continuous medical treatment from the first day that he complained about his headaches and blurred vision. However, he complains that he should not have had to wait 56 days to get an examination by the doctor and that the delay constitutes deliberate indifference to his serious medical need. The Court disagrees.

As to Defendants Nettles and Poindexter, the Court finds they responded quickly and appropriately to Plaintiff and his complaints.  It is the health services policy at Holman that nurses conduct the sick call requests in non-emergency situations, not the on-site doctor.  (See Id. at 74).  Plaintiff was seen by a nurse within 24 hours of each submitted request, and an appropriate treatment plan was ordered and affirmed by Dr. Barber at each sick call. (See generally, Doc. 17-3 at 7-39).  While it took 56 days after the C.E.R.T. incident for Plaintiff to be examined by the doctor, this delay cannot be viewed as intentional or "wanton infliction of pain," Hill, 40 F.3d at 1187, given that he received intervening medical treatment on three separate sick calls, x-rays of his skull and ribs were taken, and he was examined by an optometrist and

17

received glasses for his visual complaints.  His symptoms did not suggest any life-threatening condition(s) where it was apparent that a delay "would detrimentally exacerbate the medical problem."  Id.

Furthermore, Plaintiff has presented no "verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment."  Hill, 40 F.3d at 1188-89; see also Mann, 588 F.3d at 1307.  In fact, the evidence in the record suggests Plaintiff's problem was not exacerbated at all.  His first sick call visit involved complaints of pain on the right side of his head and rib cage.  (Doc. 17-3 at 7, 8).  His next two sick call visits were for complaints of eye pain and headaches with no mention of right rib cage pain; specifically, Plaintiff stated he was experiencing dizziness and sharp headache pains.  (Doc. 17-3 at 11-16).  It was at this time, after two sick call requests for the same symptoms, that Plaintiff was referred to the doctor.  (Id. at 16).  The requests do not mention that the headaches or dizziness occurring on May 25, 2011, were worse or more painful than those on April 14, 2011; the latter request does not state or imply that any symptom was worsening or changing with time.  (Id. at 11, 14).  Therefore, Plaintiff has not carried his burden of proving that the delay in seeing Dr. Barber constituted a

18

violation of his rights under the Eighth Amendment.  For these reasons, summary judgment for Defendants Nettles and Poindexter should be granted.[6]

Defendant Barber examined Plaintiff five days after Nurse Nettles referred him to her.  (Id. at 16, 53, 55).  Despite not personally seeing Plaintiff until June 1, 2011, Dr. Barber had reviewed each previous sick call visit of Plaintiff and was fully aware of his symptoms.  (Id. at 10, 13, 49, 50).  She verified and signed the treatment orders for Plaintiff, including the orbital x-ray, rib cage x-ray, pain medication, and optometrist referral, all prior to personally examining him.  (Id. at 55).  As discussed above, this delay was not "tantamount to unnecessary and wanton infliction of pain," Hill, 40 F.3d at 1187 (internal citations and quotation marks omitted), and did not "detrimentally exacerbate the medical problem."  (Id.).  In fact, there is no evidence of Plaintiff's condition worsening from April 7, 2011 to June 1, 2011, when Dr. Barber examined him.

---

[6] To the extent Plaintiff alleges any liability against Defendant Myers for the delay in an evaluation by Dr. Barber, this claim would also fail. The Court has found that Defendants Nettles and Poindexter followed the sick call policy of Holman and adequately and efficiently treated Plaintiff with no worsening of his condition.  Therefore, Defendant Myers, as the Health Services Administrator, would have no reason to usurp the nursing staff, its medical treatment, or the manner in which they provide the treatment.

Plaintiff has failed to carry his burden of showing the existence of a genuine issue as to any material fact regarding the delay in time it took for him to be examined by Defendant Barber.  Therefore, Defendants should be granted summary judgment on all claims related to the 56-day delay in obtaining an appointment with a medical doctor.

2.   Denial of Effective Pain Medication and Referral to
Ophthalmologist and Neurologist

For medical treatment to rise to the level of a constitutional violation, the care must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991).  In this case, Plaintiff claims that Dr. Barber failed to refer him to see an ophthalmologist and neurologist and failed to prescribe him effective pain medication despite his continuous complaints of headaches and decreased visual acuity.

There is an obvious discrepancy as to the care Dr. Barber provided and the course of treatment Plaintiff desired.  Dr. Barber ordered a precautionary x-ray of Plaintiff's skull after the C.E.R.T. incident, a MRI scan after continued complaints of sharp, painful headaches, and made three referrals to the

20

optometrist after visual complaints.[7]  None of these produced positive findings or diagnosed a problem with the Plaintiff's eyes or head.  The Court finds no evidence in the record that Dr. Barber disregarded any known risk to Plaintiff.  See Farmer, 511 U.S. at 837.  In fact, the record demonstrates that she viewed Plaintiff's complaints as a serious need and actively investigated the symptoms for which he complained.  The fact that she did not make further referrals to specialists after all diagnostic tests (x-rays, MRI scans) and optometry exams revealed negative results is a matter of medical judgment.  The fact that Plaintiff disagrees with Dr. Barber's medical judgment and feels he should have been referred to an ophthalmologist and neurologist is insufficient to support a deliberate indifference claim.  See Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (whether defendants "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding" constitutional liability); Harris, 941 F.2d at 1505 (explaining that a difference in medical opinion between the prison's medical staff and the inmate about the inmate's course of treatment will not support a claim of cruel and

---

[7] While Dr. Barber may not have been the one to physically examine Plaintiff, she was the medical doctor who signed off on each treatment plan and prescription for Plaintiff.  (Doc. 17-3 at 55-57).

21

unusual punishment). "When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989).

Additionally, there is no evidence in the record that Plaintiff suffered any detrimental effect due to being denied referrals to specialists.  See Townsend v. Jefferson Cnty., 582 F.3d 1252, 1259 (11th Cir. 2009).  During the time period of Plaintiff's submitted sick calls, April 14, 2011 through January 25, 2011, Plaintiff's complaints never changed except once on December 13, 2011, when he complained of seeing colored spots. (Doc. 17-3 at 27).  The colored spots or floaters are not mentioned thereafter at the following appointment with the optometrist or on his next sick call request.  (Id. at 30, 47). Thus, Plaintiff has not carried his burden of proving deliberate indifference to his medical care or any worsening of his medical condition due to a failure to be seen by a specialist.

Plaintiff's claim that Dr. Barber's primary and continued prescription for pain medication was ineffective does not rise to the level needed to effectually be a constitutional violation.  "There may be an Eighth Amendment violation when a jury could find that the medication provided to [the prisoner] was so cursory as to amount to no care at all," McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999), but that is not the

case at hand.  Plaintiff was prescribed one Ultram[8] tablet on
April 5, 2011, two Pain-Off tablets a day for 7 days on April
14, 2011, two Pain-Off tablets a day for 14 days on June 1,
2011, and two Pain-Off tablets a day for 7 days on August 1,
2011.  (Doc. 17-3 at 55-56).  At other times, Plaintiff was
offered pain medication (Tylenol, Motrin, and Pain-Off) during
sick calls, but he turned it down, and other times he failed to
show up for routine pill calls after he had been prescribed
medicine.  (Doc. 17-2 at 5; Doc. 17-3 at 29).  The facts of this
case are closely akin to those in Harvey v. Andem, No.
3:09cv402/WS/CJK, 2011 WL 2532681 (N.D. Fla. May 19, 2011).  In
Harvey, the plaintiff claimed a constitutional violation due to
ineffective pain medication; after normal x-ray and MRI results,
the doctor prescribed the plaintiff Motrin and would not order
any stronger medication.  Id. at *23.

> Because plaintiff's subjective complaints of the
> severity of pain and need for stronger pain medication
> were not supported by the objective medical findings,
> [the doctor] did not prescribe stronger medication.
> Plaintiff disagrees with [the doctor's] medical
> judgment, but fails to provide evidence from which a
> reasonably jury could find that [the doctor] grossly
> misjudged plaintiff's condition.  Plaintiff's non-
> medical opinion about the severity of his condition is
> insufficient to raise a genuine dispute on the issue.
> Because the record reveals no genuine dispute as to
> any material fact, and the evidence could not enable a

---

[8] Ultram "is a narcotic-like pain reliever." Drugs.com,
http://www.drugs.com/ultram.html (last visited Jan. 23, 2013).

> reasonable jury to conclude [the doctor] knew of an obvious need for stronger pain medication and disregarded that need by conduct that is more than gross negligence, plaintiff is not entitled to summary judgment. For the same reason, [the doctor] is entitled to summary judgment on plaintiff's medical deliberate indifference claim.

Id. The difference in the treatment received by Defendant Barber and that desired by Plaintiff appears to be a medical judgment call.[9] The evidentiary record reveals no genuine dispute as to any material fact, and there is no evidence that Defendant Barber knew of any objective need for stronger pain medication and disregarded that need by conduct that is more than gross negligence. Id.; see also McElligott, 182 F.3d at 1255.

As to Defendant Myers, Plaintiff contends that he is liable for supporting the medical decisions of Dr. Barber. Defendant Myers is the Health Services Administrator at Holman. (Doc. 17-1 at 1). He is not a medical professional and renders no medical services, care, or advice to inmates at Holman. (Id.). Myers is responsible for receiving medical grievances at the prison, and he or the Director of Nursing responds to the filed grievances. (Id. at 5). At no time did Defendant Myers ignore

---

[9] It is the medical opinion of Defendant Barber that Plaintiff's current complaints of head pain are related solely to his dental problems and will not be eradicated until he has his tooth extracted. See supra note 3.

24

Plaintiff's filed grievances, or cause him any detrimental effect or substantial harm by his response to any medical grievance.  Defendant Myers or the Director of Nursing responded to each one of Plaintiff's filed grievance form.  (Doc. 17-3 at 65-74).  There were no complaints in the filed grievances that called for further action on the part of Defendant Myers.  With no claim against Defendant Myers except his deference to Dr. Barber's medical decisions and given that the Court has found no constitutional violation of Plaintiff's rights by the named medical staff defendants, the Court has no evidence to find liability on the part of Defendant Myers.

Considering the totality of the circumstances surrounding the medical treatment that Plaintiff received related to his complaints from the first day that he presented with a laceration to his brow on April 5, 2011, to the present date, the Court cannot say that any of the Defendants were deliberately indifferent to his serious medical needs.  The record shows that, at all times, Plaintiff was promptly treated for his complaints.  There is no evidence that Defendants ever knew of an excessive risk to Plaintiff's health and disregarded it, nor is there "verifying medical evidence" that any delay in Plaintiff's access to medical care has detrimentally effected his medical condition.  Hill, 40 F.3d at 1188-89.  Thus,

Plaintiff has failed to establish the subjective element of his Eighth Amendment claim, and Defendants are entitled to summary judgment.

B.   *Respondeat Superior* Claim Against Defendant CMS

In this case, Plaintiff's allegations against Defendant Correctional Medical Services are premised solely on a theory of *respondeat superior*. (Doc. 1 at 6).  Plaintiff claims CMS is liable only because it contracts to provide medical services to the Alabama Department of Corrections and employees some or all of the medical professionals and/or administrative staff at Holman.  (Id.).

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."  Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (citations omitted).

> Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.  The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.  Alternatively, the causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights or when facts support an inference that the

26

supervisor directed the subordinates to act unlawfully
or knew that the subordinates would act unlawfully and
failed to stop them from doing so. The standard by
which a supervisor is held liable in [his] individual
capacity for the actions of a subordinate is extremely
rigorous.

Cottone, 326 F.3d 1352, 1360-61 (internal citations omitted)
(internal quotation marks omitted).

Plaintiff makes no allegations that CMS actually
participated in his medical care or lack there of.  Nor is there
any causal connection between CMS and the delay of medical
treatment or any lack of treatment for which Plaintiff
complains.  CMS has created no policy that results in widespread
abuse or deliberate indifference to inmates.  Therefore,
Plaintiff's claim against this Defendant fails as a matter of
law.[10]

## V.  CONCLUSION

Based on the foregoing, it is recommended that the motion
for summary judgment of Defendants Dr. Pamela Barber, Rene
Nettles, Debra Poindexter, Donny Myers, and Correctional Medical
Services, Inc. be granted and that Plaintiff's action against
these Defendants be dismissed with prejudice.

---

[10] While not directly stated in the complaint, any liability that
Plaintiff may assert against Defendant Myers relating to his
supervisory position as a Health Services Administrator would
fall under the theory of *respondeat superior* and would fail for
the same reasons stated above for Defendant CMS.

## MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.   ***Objection***.   Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.   Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.   See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982) (en banc).   The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[11] after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.   The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.   It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be

---

[11] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]"   Fed. R. Civ. P. 72(b)(2).

submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2. ***Transcript (applicable Where Proceedings Tape Recorded).*** Pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this 29th day of January, 2013.

s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE